**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1169

YURIY B. MIKHAYLOV,

Petitioner - Appellant,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent - Appellee.

On Petition for Review of an Order of the Merit Systems Protection Board. (PH-1221-19-0343-W-2; PH-1221-20-0181-W-1)

Argued: October 27, 2022                        Decided: March 15, 2023

Before KING and RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Petition for review denied by published opinion. Senior Judge Traxler wrote the opinion in which Judge King and Judge Rushing joined.

**ARGUED:** Morris Eli Fischer, MORRIS E. FISCHER, LLC, Silver Spring, Maryland, for Appellant. Kelly A. Krystyniak, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Brian M. Boynton, Acting Assistant Attorney General, Martin F. Hockey, Jr., Acting Director, Allison Kidd-Miller, Assistant Director, Commercial Litigation Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; J. Douglas Whittaker, Office of the Chief Counsel, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, Omaha, Nebraska, for Appellee.

TRAXLER, Senior Circuit Judge:

Yuriy Mikhaylov, an employee of the Immigration and Customs Enforcement division of the Department of Homeland Security ("ICE" or "Agency"), petitions for review of the final judgment of the Merit Systems Protection Board (the "Board"), which rejected Mikhaylov's claim that the Agency suspended him for two days in retaliation for his disclosures of misconduct. Finding no reversible error, we deny the petition for review.[1]

## I.

Federal agencies are prohibited, *inter alia*, from taking or failing to take a "personnel action" against an employee because of any disclosure of information made by the employee that the employee "reasonably believe[d]" showed a "violation of any law, rule, or regulation" or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. §§ 2302(b)(8)(A)(i) & (ii).

An employee who believes a personnel action was reprisal for protected whistleblowing may file an action with the Board (termed an appeal) seeking "corrective action." 5 U.S.C. § 1221(a); *see Zachariasiewicz v. U.S. Dep't of Justice*, 48 F.4th 237, 242-43 (4th Cir. 2022). The employee may seek judicial review of the Board's decision "in the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction." 5 U.S.C.A. § 7703(b)(1)(B).

---

[1] In Case No. 21-2429, *Mikhaylov v. United States Department of Homeland Security*, Mikhaylov challenges a separate disciplinary action that took place shortly after the events in this case. We dispose of that appeal in an unpublished opinion also filed today.

To prove a whistleblower claim, the employee bears the burden of proving by a preponderance of the evidence that he made a qualifying disclosure, and that the disclosure was a "contributing factor in the personnel action" taken against the employee. 5 U.S.C.A. § 1221(e)(1). Even if the disclosure was a contributing factor, however, the employee is not entitled to corrective action if "the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 1221(e)(2).

## II.

Against this statutory background, we turn now to the facts. Mikhaylov has worked for ICE since 1998. Mikhaylov's work history includes a stint at ICE headquarters as Section Chief and Acting Chief over firearms instruction. In 2018, Mikhaylov was serving as the Assistant Field Office Director for the office in Baltimore, Maryland. He reported to Field Office Director Dorothy Herrera-Niles.

ICE agents often carry their own firearms in addition to the firearms issued to them by the Agency. ICE policy provides that the Agency will supply ammunition for personally-owned weapons, but the employee must provide the holsters and magazines for any personally-owned weapons used on the job. In July 2018, Herrera-Niles directed Mikhaylov to acquire certain accessories for firearms, including 30 magazines and ankle holsters for a specific model of Glock handgun—the "Glock 43"—as well as a supply of holsters and magazines for another Glock handgun, the "Glock 26." While many of the agents at the Baltimore office carried those Glock models, only one Glock 43 and one Glock 26 were government-issued weapons; the rest were personally-owned weapons.

3

Mikhaylov directed Savinder Jaspal to obtain the items requested by Herrera-Niles. Jaspal was a Supervisory Detention and Deportation Officer who had also served for more than two years as Senior Firearms Instructor. According to Jaspal, "the gist" of his conversation with Mikhaylov was that the items to be purchased were "for [personally-owned weapons] throughout the office." J.A. 635; *see* J.A. 638 ("As far as I was informed or as far as I understood they were to supply [Herrera-Niles] and other people with [personally-owned weapons] accessories for their firearms.").

After Jaspal determined that the requested items were not available through a government database of available inventory, he checked back in with Mikhaylov, who directed Jaspal to use the Agency purchase card to buy the items. Mikhaylov told Jaspal that there could be something inappropriate about the purchase because of a policy he learned about while working at ICE headquarters against paying for accessories for personally-owned weapons. Jaspal testified that Mikhaylov said that since Jaspal didn't know about that policy, he should go ahead with the purchase.

After his conversation with Mikhaylov, Jaspal made inquiries to ICE's Armory Operations and an ethics office about the propriety of the purchases and was informed of the policy prohibiting the use of Agency funds to purchase holsters or magazines for personally-owned weapons. On July 18, Jaspal informed Mikhaylov that he would not be purchasing the requested items because it violated Agency policy. Jaspal told Mikhaylov that the purchase card was in his name and that he did not want to be held responsible for an unauthorized purchase.

4

Less than an hour after learning that Jaspal would not make the purchases, Mikhaylov, after a conversation with Herrera-Niles, began the process of removing Jaspal from his position as Senior Firearms Instructor. Jaspal found out a few hours later that he had been removed through a phone call from Phillip Meadows, the man tapped by Mikhaylov to replace Jaspal. Jaspal told Meadows he believed he had been replaced because he refused to purchase the items requested by Mikhaylov.

On July 20, Jaspal filed a complaint with the Joint Intake Center alleging that Mikhaylov removed him from his position in retaliation for Jaspal's refusal to violate ICE policy by purchasing the requested accessories. Jaspal was never directly informed about the decision by Herrera-Niles or Mikhaylov. Before he was removed from the position, Jaspal had not been counseled about any performance issues, and no concerns about his performance had been raised in his employee evaluations.

ICE's Office of Professional Responsibility ("OPR") began an investigation of Jaspal's complaint. OPR interviewed numerous witnesses, including Mikhaylov and Jaspal. In his interview, Mikhaylov confirmed that he was aware of "guidance" from ICE that the employees themselves must purchase any accessories for personally-owned weapons. *See* J.A. 345 (stating that the guidance was "for the personal weapons the officer . . . needs to buy the stuff himself"). He also acknowledged telling Jaspal about the guidance and that there might be something "inappropriate" about purchasing the requested items. J.A. 353-54.

Mikhaylov told the investigators that he called Herrera-Niles a few minutes after talking to Jaspal and informed her that Jaspal would not make the purchase because it

5

violated Agency policy. When asked what Herrera-Niles' response was when she learned about Jaspal, Mikhaylov began talking about the fact that he and Herrera-Niles had already had "a lot of different issues" with Jaspal. J.A. 361. After cataloging his various concerns about Jaspal, Mikhaylov said his concerns were not necessarily the reasons that Herrera-Niles removed Jaspal from his position, and that he "d[idn't] know why she made that decision." J.A. 363. Mikhaylov ultimately was able to recall that Herrera-Niles "brought up some of the short comings that Jaspal already had and everything else," and that "she ask[ed] who I wanna put in." J.A. 363.

While the investigation was proceeding, Mikhaylov made the disclosures that he contends entitle him to whistleblower protection. In October 2018, Mikhaylov questioned Janean Ohin, his supervisor in the Baltimore office, abouts reports that she had ignored a national list of qualified candidates so she could hire her preferred job candidate. Later in October, Mikhaylov complained that Diane Witte, who succeeded Herrera-Niles as Baltimore Field Office Director,[2] had violated merit principles by wrongfully reassigning his duties. Mikhaylov repeated these allegations in a December 2018 complaint filed with the Office of Special Counsel. And in April 2019, Mikhaylov reported to his supervisors that an Agency employee had been using an Agency vehicle for personal purposes.

At the conclusion of its investigation of Jaspal's complaint, OPR recommended that the matter be referred to management. OPR submitted an extensive report, including

---

[2]      Herrera-Niles retired at the end of August 2018, while the investigation into Jaspal's complaint was proceeding.

transcripts of the interviews, to the Disciplinary & Adverse Action Panel, a rotating panel of independent managers that reviews disciplinary investigations, identifies possible misconduct, and recommends appropriate punishments about corrective actions. The panel submits its recommendations to the Deciding Official, who makes the ultimate determination of whether misconduct occurred and what punishment should be imposed.

The disciplinary panel convened in this case concluded that Mikhaylov committed conduct unbecoming a supervisor by directing Jaspal to make a purchase that was prohibited by ICE policy and recommended that Mikhaylov be suspended for fourteen days. The Deciding Official[3] rejected Mikhaylov's claim that the proposed discipline was reprisal for his whistleblowing activity and concluded that evidence supported the panel's determination that Mikhaylov engaged in conduct unbecoming a supervisor. The Deciding Official, however, after considering Mikhaylov's long career and "favorable work performance," concluded that the appropriate punishment was a two-day suspension rather than the fourteen-day suspension recommended by the panel. J.A. 27.

Mikhaylov appealed his suspension to the Board. An administrative judge held a hearing over the course of three days and heard testimony from sixteen witnesses. The administrative judge concluded that three of the four disclosures relied upon by Mikhaylov qualified as disclosures protected under the statute—his October 2018 report about Ohin's improper hiring practice; his December 2018 report to the Office of Special Counsel; and

---

[3]      Because one of the disclosures relied upon by Mikhaylov involved his then-supervisor Witte, she was removed as the Deciding Official and was replaced by a supervisor outside of Mikhaylov's chain of command.

7

his April 2019 report about the improper use of an official vehicle. The judge nonetheless determined that Mikhaylov failed to prove that the protected disclosure contributed to the Agency's decision to take the personnel actions and that, in any event, the Agency had established by clear and convincing evidence that it would have taken the actions even in the absence of any disclosures.

The administrative judge rejected Mikhaylov's assertion that the personnel actions were retaliation for his protected disclosures. The judge noted that the investigation into Mikhaylov was not initiated by any of his supervisors, but instead by OPR after the complaint by Jaspal, Mikhaylov's subordinate, and the judge credited Jaspal's testimony at the hearing that he had no knowledge of Mikhaylov's whistleblowing. The administrative judge likewise credited the testimony of the disciplinary panel member who signed the notice of proposed suspension that she personally liked Mikhaylov and had no knowledge of his whistleblowing and that the question of his whistleblowing was never raised during the panel's deliberations. Although the Deciding Official became aware of Mikhaylov's disclosures through Mikhaylov's response to the panel's recommendation, the Deciding Official testified that the disclosures had no effect on his deliberations. The administrative judge credited this testimony and observed that the Deciding Official imposed a significantly lower punishment than the panel recommended, an action that undermines any suggestion of retaliatory motive.

The administrative judge therefore sustained the two-day suspension and denied Mikhaylov's request for corrective action. Because the Board lacked a quorum of

members, the administrative judge's decision became the final decision of the Board and

is the subject of Mikhaylov's petition for review now before this court.

III.

"When a whistleblower claims an agency took an impermissible personnel action,

the [Board] evaluates the case using a burden-shifting framework." *Flynn v. United States*

*Sec. & Exch. Comm'n*, 877 F.3d 200, 204 (4th Cir. 2017). The employee must first

> establish a prima facie case by demonstrating four facts: (1) the acting official
> has the authority to take, recommend, or approve any personnel action; (2)
> the aggrieved employee made a protected disclosure; (3) the acting official
> used his authority to take, or refuse to take, a personnel action against the
> aggrieved employee; and (4) the protected disclosure was a contributing
> factor in the agency's personnel action.

*Id.* (cleaned up). The employee may use circumstantial evidence to prove that the protected

disclosure was a contributing factor, including evidence showing that "(A) the official

taking the personnel action knew of the disclosure or protected activity; and (B) the

personnel action occurred within a period of time such that a reasonable person could

conclude that the disclosure or protected activity was a contributing factor in the personnel

action." 5 U.S.C.A. § 1221(e)(1). If the employee establishes that a protected disclosure

was a contributing factor, the agency must then prove "by clear and convincing evidence

that it would have taken the same personnel action in the absence of such disclosure." 5

U.S.C. § 1221(e)(2).

Our review of the Board's decisions is very limited. "We may only set aside agency

actions, findings, or conclusions if they are (1) arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law; (2) obtained without procedures required by law,

9

rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Flynn*, 877 F.3d at 204 (cleaned up).

A.

Mikhaylov first challenges the administrative judge's determination that the protected disclosures were not a contributing factor to the Agency's actions. As noted above, an employee may prove that a disclosure was a contributing factor through circumstantial evidence showing that the official taking the personnel action knew of the disclosure and that "the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1)(B). Mikhaylov contends the disclosures here were contributing factors as a matter of law because the Deciding Official learned about the disclosures during his review of the case file shortly before imposing the suspension.[4] We disagree.

The statute does not provide that a protected disclosure automatically becomes a contributing factor in every case where a personnel action is finalized shortly after protected disclosures come to light; a disclosure is a contributing factor only when the confluence of the official's knowledge and the timing of the action *reasonably* suggests a

---

[4] Although Mikhaylov discusses the knowledge of the members of disciplinary panel in his brief, he nonetheless makes it clear that his argument focuses on the actions of the Deciding Official. *See* Brief of Appellant at 9 ("Thomas Feeley . . ., the Agency deciding official, was aware of the disclosures prior to issuing the discipline."); *id.* at 10 ("[T]he personnel action challenged was not the proposed suspension, but the actual two day suspension, to which Feeley was the decision maker.").

10

connection between the two. *See* 5 U.S.C. § 1221(e)(1). When disciplinary action is initiated fast on the heels of an employee making a protected disclosure, a reasonable person could easily conclude that the discipline was in retaliation for the disclosure. On those paradigmatic facts, the protected disclosure must be viewed as a contributing factor. *See, e.g., Kewley v. Department of Health & Human Services*, 153 F.3d 1357, 1363 (Fed. Cir. 1998) ("If a whistleblower demonstrates both that the deciding official knew of the disclosure and that the removal action *was initiated* within a reasonable time of that disclosure, no further nexus need be shown, and no countervailing evidence may negate the petitioner's showing.") (emphasis added).

The facts of this case, however, are very different from the paradigmatic whistleblower case. Here, the disciplinary process was initiated *before* Mikhaylov made the protected disclosures—the Agency began investigating after Jaspal made his complaint in July 2018, and Mikhaylov made his first protected disclosure in October 2018. To be sure, the Deciding Official did impose the two-day suspension shortly after he learned through the case file that Mikhaylov had made protected disclosures. The Deciding Official, however, came from an office outside of Mikhaylov's chain of command and was not connected in any way to the disclosures. Moreover, the Deciding Official testified that he did not consider the disclosures when determining the appropriate sanction, and he imposed a significantly less severe suspension than was recommended by the disciplinary panel.

Contrary to Mikhaylov's argument, these facts simply do not compel the conclusion that the disclosures were contributing factors to the personnel action. *See Madrid-Montoya*

11

*v. Garland*, 52 F.4th 175, 179 (4th Cir. 2022) ("We review factual findings for substantial evidence, which means we treat them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.") (cleaned up). Instead, it was for the administrative judge to determine whether Mikhaylov's protected disclosures could reasonably be viewed as contributing to the personnel action. The administrative judge, finding the Deciding Official's testimony to be credible and observing that the shorter suspension imposed supported the official's claim that the disclosure had no effect on his decision, concluded that the disclosures did not contribute to the personnel action. That is a reasonable view of the facts in the record, and our standard of review does not permit us to reject it. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (cleaned up); *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020) (explaining that under substantial-evidence review, "we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ") (cleaned up).

## B.

Mikhaylov also challenges the administrative judge's alternate determination that, even if the protected disclosures did contribute to the personnel action, the Agency proved by clear and convincing evidence that it would have taken the same action even without the disclosures. *See* 5 U.S.C. § 1221(e)(2).

12

When considering whether the Agency carried its burden, the administrative judge applied the factors synthesized by the Federal Circuit in *Carr v. Social Security Administration*:

> the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Carr*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). The *Carr* factors have been adopted by several circuits. *See Marcato v. United States Agency for Int'l Dev.*, 11 F.4th 781, 783, 786-90 (D.C. Cir. 2021); *Duggan v. Dep't of Defense*, 883 F.3d 842, 846 (9th Cir. 2018); *Mottas v. Dep't of the Army*, 720 F. App'x 912, 915-18 (10th Cir. 2017); *King v. Dep't of the Army*, 570 F. App'x 863, 866 (11th Cir. 2014).

Although this court has not issued a published opinion addressing the issue,[5] we have utilized the *Carr* factors in an unpublished opinion. *See Weber v. Dep't of Veterans Affs.*, 2022 WL 1797321, at *2 (4th Cir. June 2, 2022) ("The parties submit that we should follow the [Board's] lead in using the factors set forth in *Carr* . . . to determine whether Appellee has demonstrated it would have otherwise terminated Appellant, and we agree."). We believe the *Carr* factors provide useful guidance for evaluating the agency's claim that

---

[5]      Previously, appellate jurisdiction for federal whistleblower claims lay exclusively with the Federal Circuit, unless the case was a "'mixed case'. . . alleging both a prohibited personnel action and discrimination." *Flynn v. United States Sec. & Exch. Comm'n*, 877 F.3d 200, 203 (4th Cir. 2017). In 2012, Congress gave the employee the option of seeking review by the Federal Circuit or the local Court of Appeals. Because we have (relatively) recently begun handling these cases, issues that are "well established in the Federal Circuit's case law" are often "matter[s] of first impression" here. *Id.*

13

it would have taken the personnel action regardless of the disclosures, and we therefore apply them in this case.

The first *Carr* factor is the strength of the agency's case supporting the personnel action. The administrative judge concluded that the record evidence clearly and convincingly established that Mikhaylov engaged in conduct unbecoming a supervisor. *See* J.A. 758 ("[T]he voluminous evidentiary record more than establishes the charge by clear and convincing evidence."). When making this determination, the judge pointed to the thorough investigation and report prepared by OPR and to Jaspal's testimony that he understood Mikhaylov to be directing him to purchase holsters and magazines for personally-owned weapons despite Mikhaylov's acknowledgement that the purchase might be inappropriate and Jaspal's belief that he was removed from his position because he refused to make the inappropriate purchase.

Mikhaylov's argument on appeal amounts to little more than disagreement with the administrative judge's view of the case. Mikhaylov insists that he never ordered Jaspal to purchase accessories to be issued to agents using personally-owned weapons on the job. Instead, he claims the holsters and magazines were intended for use at the firing range, where they would be loaned out to agents who came for training but neglected to bring the required accessories for their personally-owned weapons. The record does contain some support for that theory, in the form of Mikhaylov's own testimony before the Board. However, the record also contains voluminous evidence to the contrary, including the OPR report and exhibits; Jaspal's testimony and the emails he sent to agency ethics and legal departments asking about the propriety of purchasing accessories for personally-owned

14

weapons; and the testimony of Phillip Meadows, who replaced Jaspal as senior firearms instructor and was the person who told Jaspal about his demotion. The administrative judge was persuaded by that evidence, not Mikhaylov's testimony, and the standard of review does not permit us to second-guess the Board on this point. *See Madrid-Montoya*, 52 F.4th at 179-80 (Under substantial-evidence review, "we cannot substitute our judgment for that of the agency's by reweighing the evidence and determining which of the competing views is more compelling.") (cleaned up).

The second *Carr* factor requires consideration of "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision." *Carr*, 185 F.3d at 1323. As the administrative judge observed, it was Jaspal's complaint that started the disciplinary ball rolling, not any action by Mikhaylov's supervisors. The disciplinary panel was composed of independent managers who were not part of Mikhaylov's chain of command and had no involvement in the actions outlined in Mikhaylov's protected disclosures. The disciplinary panel member who signed the suspension proposal testified that Mikhaylov's disclosures were not discussed during the panel deliberations. In addition, as previously discussed, the Deciding Official was also outside Mikhaylov's chain of command with no involvement in the protected disclosures, and the Deciding Official testified that he gave no consideration to the protected disclosures when reviewing Mikhaylov's case and deciding the appropriate punishment. When concluding that the officials involved in the personnel action had little reason to retaliate against Mikhaylov, the administrative judge explicitly credited the testimony of the disciplinary panel and the Deciding Official. The administrative judge also noted that the

15

"greatly mitigated penalty [imposed by the Deciding Official] suggests there was no retaliatory motive." J.A. 758. Again, our standard of review does not permit us to reject the administrative judge's finding, which rested on significant evidence in the record and the judge's own determinations of witness credibility.

The third *Carr* factor requires consideration of "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr*, 185 F.3d at 1323. Mikhaylov contends this factor shows retaliation, because Jaspal also filed a complaint against Herrera-Niles, Mikhaylov's then-supervisor and the person who requested the holsters and magazines, but she was not disciplined by the agency. The administrative judge concluded that the failure to discipline Herrera-Niles did not show retaliation because Herrera-Niles retired in August 2018, shortly after Jaspal's complaint, and the agency has a policy of not pursuing disciplinary actions after an employee retires.

As Mikhaylov points out, sometime in the fall of 2018, while the investigation was still ongoing, Herrera-Niles was rehired by the Agency for the office in San Antonio. She was rehired under the terms of a global settlement agreement resolving then-pending litigation. The record contains no details on the settlement, including whether the settled action was in any way connected to Mikhaylov. While that information might perhaps undermine the Agency's explanation for its failure to take action against Herrera-Niles, it is not up to this court to figure out how those pieces of information interact. The administrative judge heard all of the evidence, weighed it, and concluded that the Agency's different treatment of Herrera-Niles did not show that the Agency was retaliating against

16

Mikhaylov. Our standard of review requires us to accept the administrative judge's view of the issue. *See Madrid-Montoya*, 52 F.4th at 179–80 ("[I]f the record plausibly could support two results: the one the agency chose and the one the petitioner advances, we must defer to the agency.") (cleaned up).

Because the administrative judge committed no legal error when applying the *Carr* factors and his factual findings are supported by substantial evidence, we reject Mikhaylov's challenge to the administrative judge's conclusion that the Agency carried its burden of proving that it would have taken the same disciplinary action in the absence of the disclosures.

IV.

After conducting a hearing and considering the evidence, the administrative judge denied the corrective action sought by Mikhaylov, concluding that Mikhaylov's protected disclosures were not contributing factors to the discipline imposed and, alternatively, that the Agency proved by clear and convincing evidence that it would have taken the action even in the absence of the disclosures. Because the administrative judge committed no legal error and his factual findings are supported by substantial evidence, we deny Mikhaylov's petition for review.

*PETITION FOR REVIEW DENIED*